Thank you, Your Honor. May it please the Court, Counsel. My name is Michelle Iafrate. I'm here today representing Sheriff Arpaio, along with me is my colleague Courtney Kloman. Your Honors, this is over a 30-year-old class action lawsuit dealing with the conditions of confinement in the Maricopa County Jails. Not only have the jails changed since 1977, so has the Sheriff. Originally this was called Hart v. Hill, which you have heard previously once it came up on appeal. In my brief to you all, I raised three issues. One deals specifically with the procedure that occurred in the District Court, not giving Sheriff Arpaio the opportunity to fashion the remedies that he saw fit, needed, necessary, and the least intrusive. The other two issues deal directly with remedies that were dictated by the District Court. First, discussing the procedure. Sheriff Arpaio was placed in an unenviable position where the argument below was there were no constitutional violations, no ongoing systemic constitutional violations in the jails. That's what was presented. However, the Court also wanted the Sheriff's Counsel to fashion remedies. Following the hearing, 94 paragraphs of the original consent decree were terminated. If Sheriff Arpaio's Counsel did what the Court had ordered, then Counsel would need to not only argue there are no constitutional violations, but also come up with a remedy where there were no ongoing constitutional violations. Those two conflict with each other. Well, they may involve a little extra work, but do they involve more extra work than imposing upon the District Court the requirement to have an entirely separate phase of the trial? Do you have any authority to support the proposition that, in fact, the parties can impose upon the District Court the obligation to have an entirely separate phase? Imposition is a strong word, Your Honor. However, there is some support, not only provided by me in the briefs, but also supplied by the appellees. I used the cases Prizer and also Lewis v. Casey, and appellees point out those aren't termination cases. However, the analysis is the same. First, you need to find some sort of constitutional violation. Then you go to the remedy. I also turn to the PLRA specifically that talks about what needs to be done in a termination proceeding. The PLRA specifically talks about that in the relief phase, you shall respect the principles of comity set out in paragraph 1B. It also talks about the ability of the courts to invade on the state and the county and the jails on how they are best to operate. Well, see, I view the issue differently. There's no doubt, and maybe I should find out if you have a difference of view on this subject, it seems to me there's no doubt that the District Court made it clear it was going to take care of all of the issues at the same time. If that's the case, if the sheriff elects not to put up alternative remedies, I'm not sure why that's the court's fault. That's the decision made by the sheriff. He doesn't want to go to the extra worker proposing alternative remedies if he thinks he's going to win on no constitutional violation. But if he doesn't win on no constitutional violation, he's taken the position voluntarily. I have no alternative revenue to propose. Why is that the court's problem? I don't believe it is the court's problem except for that it violates the separation of powers. Wait, wait, no, stop, right there. How could it violate the separation of powers if the court clearly indicated, okay, turn it in by this time, I'll consider it, and the sheriff elects not to turn anything in by that time? How does that violate the separation of powers? Because instead of relying on first determining whether there was a constitutional violation, we skip directly to the remedy phase. No, no, he didn't skip directly to the remedy stage. In fact, he decided there was no constitutional violation and terminated all sorts of provisions. But for some, he determined there was still a constitutional violation. Let's consider remedy. Uh-oh, sheriff has elected not to say anything about remedy, although the court's instructions are clear. Where's the violation of separation of powers? It doesn't seem to me like this is the separation of powers. It seems to me this is the court's ability to manage its caseload. We were on a fast track, you are correct, and the judge was trying to manage its caseload. However, I submit to you that providing one more day to allow remedies if constitutional violations are found would actually be a more appropriate way to manage a caseload than for the sheriff to actually come forth with over 94 remedies of paragraphs that were ultimately terminated. Well, you may make a sense, have a sense that might have been more efficient for the sheriff. It's the district court that's deciding that, and why is that an abuse of the district court's discretion since ordinarily management of workload is a discretionary issue? However, the interpretation of the PLRA is de novo. But we're not talking about the PLRA because there's no question but that the sheriff had the opportunity to say whatever he wanted to say with regard to remedy. He elected not to take advantage of the opportunity. That's why I say in my view this is purely a matter of case management, its workload. There was never a statement saying to the sheriff, you're not allowed to speak about remedy. It was made very clear that the judge was going to consider this all at once. And it was not the judge's decision that the sheriff elected not to say anything about remedy. That's the sheriff's decision. Am I wrong on that? You are not wrong that the sheriff chose not to submit remedies in addition to arguing that there was no ongoing constitutional violation. However, I do submit to you that the case law asked for wide discretion for the jails to run themselves. And in fact, this issue not only came up at the beginning of the hearing when the court discussed the procedure, but also in the midst of the hearing when appellees were the ones that came forward and said, if you do not separate the remedy from the analysis of the ongoing constitutional violation, then you actually are building an heir into this hearing. And that was not from the sheriffs. That was from my adversaries. Well, maybe we'll see how good their predictive power is toward what we're going to say. But it seems to me if there's no question but that the sheriff understood there was going to be one phase, not two, how it becomes the court's problem that the sheriff elects not to speak to the remedy issue when he had the opportunity. I submit to you that you could not combine those two. Even though you're saying that it's just purely for the sake of monitoring his calendar or managing his calendar, I submit to you that the case law as well as the PLRA indicate that the remedial phase should be separate. And what authority do you cite to support that proposition? Well, I discussed the provision of PLRA that talks about the separation of powers. You did not come along with me regarding that this is a separation of powers case, Your Honor. But I also cite to the subsection that talks about special masters where it specifically talks about during the remedial phase, which implies that they anticipate that there is a remedial phase following the constitutional violation phase. Counsel, I would like you to turn to the actual things that were found unconstitutional. Do you challenge any of those? I do, Your Honor. So we need to hear about that. Very well. And then we need to hear about whether you think the remedy which was specified is inappropriate. Very well. In my brief, I discussed two specific remedies that were put forth by the district court following his finding that there were constitutional violations. The first one deals with the food issue. Now, case law submits that the food does not have to be aesthetically pleasing. It just needs to maintain health. In the consent decree below, where both parties agreed, but that does not mean that there are constitutional violations, that there are the constitutional minimums, the parties agreed to the ADA standards at that time. There was no information or any evidence that showed that those were the constitutional minimums. And the court on his own set forth the remedy that all parties should follow the ADA guidelines, the new ADA guidelines regarding the USDA guidelines. Yes, excuse me. And the appellees argue, well, no bother, because you agreed to that in the consent decree. And I submit to you, and this is what the PLRA says and what Gilmore says, that you could not give a remedy that exceeds the constitutional minimums. There was nothing in the case record that indicates that this was the minimums, and, in fact, it exceeds the constitutional minimums. Although it's a guideline. Was there expert testimony in this case that there was a different standard, a lower standard from USDA nutrient regulations, that would have met the constitutional standard of maintaining health? No. There was testimony from a dietician and a quality assurance person regarding the food that was provided and the nutrients and the contents. There was also testimony submitted from then-class experts, sanitarian, that discussed the quality that he found in the food factory and the supporting the providing of the food that he thought was exceptional. Judge Wake found that the evidence by Mr. Reddy, the state's, the county's witness, was not credible. That is correct. Was that an abuse of discretion, then, by Judge Wake, finding Mr. Reddy not to be credible? I believe that it was an abuse of discretion, Your Honor. What about that determination was illogical, implausible, or not based on inferences which could be drawn from the record, which under Hinkson would make it an abuse of discretion? Your Honor, Mr. Reddy's testimony was very difficult to understand. English is not his first language, and there was a lot of confusion while he was on the stand regarding micronutrients and macronutrients and how best a dietician could determine whether the food provided sustained health or not. And Judge Wake saw Mr. Reddy? Yes. He appreciated his demeanor and the way he answered questions? Correct. Perhaps the way he didn't answer questions? I believe he did answer the questions. He made a determination that Mr. Reddy wasn't good goods. I understand what you're saying. What's wrong with that? Isn't that what judges do every day? That is what judges do and what juries do also. However, my issue isn't specifically with Mr. Reddy. It's with Judge Wake unilaterally determining which standard or guidelines should apply because there was no testimony regarding guidelines being constitutional minimums. There was no testimony saying in order to keep nutritional, to nutrition up to, so the health of the prisoners would be adequate. Maintaining health, yes. You have to have USDA. Nobody said that. Correct. So where did he get this idea? Where did Judge Wake get the idea? In testimony he said, I just used the modern standard of what you agreed to in the consent decree. So his error was in accepting what the parties had set as a standard in a consent decree as being the constitutional norm. No, the parties never, ever agreed that that was the constitutional norm. Well, no, but they had agreed to it in the consent decree. Correct. And his error was in saying, well, if the parties agree to do something, then that's what the Constitution requires. That's the error. Correct. And he made a specific factual finding, number 369, no persuasive evidence was presented to show the Department of Agriculture's guide to daily food choices exceeds minimal requirements for adequate nutrition. Is that finding of fact accurate? That is accurate. So there was no evidence that demonstrates it exceeds the minimum. What is he supposed to do? If the sheriff elects not to put on evidence to say that it exceeds the minimum, why is he supposed to assume that it exceeds the minimum? Your Honor, we come full circle, because then there's supposed to be a remedial phase regarding what should be the remedy and give deference to the jails, as all the case law is saying. If he says in advance, I'm doing it once, and the sheriff decides I'm not doing it the first time, I'm going to show the judge who's boss, I don't like the sheriff's odds of that fight. I mean, why is it that the court has to wait until later to finally hear what the sheriff thinks he has to say? Why can't the court say, tell me now? And if the sheriff elects not to do it, the court say, you didn't tell me. Well, Your Honor, in theory, the hearing did or not in theory, in reality, the hearing did not develop that way. It was very bifurcated regarding medical and the jail conditions, and we were putting on testimony as it came through the door. So the sheriff saying, I'm going to show you who's boss, I take issue with that, because the sheriff was not in the courtroom dictating, I'm going to show this judge who's boss. So I don't want there to be any ---- Well, I don't mean the sheriff personally, the county. I mean, the party on that side, speaking through counsel, has taken a position as to what evidence is going to submit at what time. If the court says do it all now, presumably you have to do it all now. If the court enters a finding and says no evidence is submitted to show that it exceeds the minimum, that apparently is factually correct. Why is the court required to say, we're going to give this party a second opportunity later to submit the evidence that wasn't submitted the first time? Because the case law indicates that you are to give deference to the jails to run themselves, rather than have edicts from the court telling them how best to run their jails. Can we thank you? We'll hear from the appellees. Thank you, Your Honors, and may it please the Court, I'm Margaret Winter for the Appellees. Before I go to my prepared narrative, I want to answer a couple of particular points that came up during your questioning of Ms. Iafrate. First, where did the idea come from in the judge's mind? Was there any evidence at all about the USDA guidelines? Yes, there was. I believe it's Exhibit No. 5 under the Reddy testimony of a memo that he had prepared that says that it's based on the USDA guidelines. He says that's what he does.    He says that's how he does it. But that's understandable under the consent decree. There's a consent decree which calls out the standard being the USDA guidelines, and he says to find we follow USDA guidelines. The question should have been put to him, based on the law, is that required to maintain such nutrition as to maintain health, which I believe is the Supreme Court standard. That question wasn't put to him, was it? Your Honor, it didn't need to be put to him from the plaintiff's point of view because that consent decree had been stayed for at least five, if not seven, years. The sheriff's testimony was that they were preparing food that met the dietary needs of inmates, and the way they were doing it was by following USDA guidelines. And if they had been doing that without the compulsion of a consent decree, but on their own for five to seven years since the automatic stay went into effect, and that was everything that they relied on at this hearing, I think that Judge Wake had very good reason to think that this is what the sheriff thinks is the minimal that they need to do to meet constitutional violations. There was no compulsion of consent decree here. Was there evidence that these prisoners were not being nutritionally treated adequately? There was plenty of evidence. Many prisoners, detainees testified. Get behind the mic. Many detainees testified that the food was so inadequate that they were losing weight, that the food was so inedible that they could not eat it, that it literally could not be eaten because they were being served rotten and moldy food that had been donated free to the sheriff. Furthermore, Mr. Reddy himself admitted that he was serving, he had decided to for people in a category who were moderately active. So I think there was ample evidence that the food was inadequate and the judge found that it was, that it was contrary to the evidence that they were being fed adequate nutrition. I, although we didn't really hear about this during Mr. Wake's testimony, I think Ms. Iafrate's presentation, I'd also like to turn to the subject of temperature. The, it is only in the reply brief that Ms. Iafrate raised the issue, claimed that I should say first about food, that the food was, finding was factually unsound. In her opening brief, the one item where she said that the court incorrectly made a finding of unconstitutionality had to do with temperature. And the, I want to go over that a little bit because I believe that the evidence in the briefs mischaracterizes, that the brief, Ms. Iafrate's brief, mischaracterizes the evidence. The trial judge did not order a comfortable jail. The remedy the court entered was aimed at protecting a specific class of medically vulnerable prisoners from temperatures that could kill them. He found that temperatures in excess of 85 degrees prevailed in some of the housing areas, that temperatures in excess of 85 degrees put people on psychotropic medications at great risk for heat stroke, and that the sheriff does not know where he houses people on psychotropic medications. The evidence was not found in the brief. Kennedy. Who testified that 85 degrees rather than 80 degrees or 90 degrees was the cutting point? Dr. Stewart, plaintiff's expert, testified to 85 degrees. And that testimony was not a surprise. It came from an expert report that he submitted before trial and that he was deposed on. The defendant's expert, Dr. Drapeau, then was the first one to testify on his subject at trial, knowing that that was plaintiff's testimony, expert testimony. She asked under questioning on direct by the county's lawyer, now, isn't there some, is there some problem here about housing prisoners on psychotropic medications in hot housing? And she said, yes, there is. She did not qualify it as to certain psychotropic medications. She said there is a problem. You have to monitor their blood levels. There is a danger of heat stroke. And for that reason, the medical, the psychiatric unit, we keep cold. Now, Dr. Stewart, so she, there was no qualification as to certain psychiatric medications. It was psychiatric medications. Dr. Stewart broadly testified that there are certain. Kennedy, did Dr. Drapeau have a different Fahrenheit reading than Dr. Stewart as the dangerous point? No, she, no. She presented no. No, no. She, she did not. There is no disagreement in this record. It is uncontested that it's 85 degrees scientifically that poses the risk to people on psychotropic medications. That is completely uncontested on this record. Okay. Dr. Stewart testified that there's a wide variety of psychiatric medications, antipsychotic medications, antidepressants, antichologenic medications, all of which present this risk. The sheriff's argument seems to be Dr. Stewart originally used the word certain medications cause the risk. That means there must be certain medications that don't cause the risk. Therefore, the remedy entered was too broad. But there was no evidence whatsoever presented by the sheriff that that remedy was too broad. The remedy simply being don't house prisoners on psychotropic medications in housing areas where the temperature exceeds 85 degrees.  And the same with respect to all of the other remedies that the judge entered. I should mention that the idea that the sheriff had to somehow was under the gun to present 95 remedies because 95 paragraphs were at stake simply isn't accurate. The parties agreed, the plaintiffs agreed to drop all but quite a limited small handful of issues with respect to the sheriff. So this parade of horribles that there were 95 remedies that the sheriff had to come up with simply isn't the case. As to the question of how much of what was the sheriff somehow badly damaged, was he prejudiced in any way by the failure of the trial judge to hold a separate proceeding after the evidentiary hearing, the reality here is there has not been any harm whatsoever shown by the sheriff, because the sheriff up to today has never yet proposed narrower or less intrusive remedies. Now, he, Sheriff Arpaio, we know, is a highly experienced litigant. And if, I think it is very difficult to believe that the sheriff could not have found a way to call to Judge Wake's attention after those, after the judge's injunction issued, that there was a serious issue. Judge Wake is nothing if not an eminently reasonable jurist. I think the sheriff knows that if he had brought a motion for reconsideration, a motion for a stay, a motion in this Court for a stay, with declarations simply explaining why these remedies were overly burdensome or overly intrusive, Judge Wake would have listened. And I assume that the reason that that never came up is because the sheriff can't propose anything narrower or less intrusive with respect to the problem that the toilets don't work and the holding cells, than to say, make sure the toilets work. There isn't anything narrower or less intrusive to stay. If there had been, I think we would have heard about it from the sheriff. Let me shift the focus a little bit. And it may be while they're on appeal, they're inhibited. But once the appeal is concluded, to the extent that anything remains in effect and it appears clear that something would still remain in effect, is there anything that prevents the Court from revisiting those in the future? This is an ongoing relief action. Could the county take it back to the Court and say, okay, conditions have improved in this fashion, this is what the decree should be modified to or should be set aside today? Yes. The sheriff certainly can revisit it. He can claim that there are changed circumstances. He can come back in this coming, he can come back in October and say, two years have passed since this decree was entered. I move to terminate or I move to modify because the existing remedies, which I have been and here is my evidence. Nothing will stop him from putting on that case. But the reality is he never saw to stay. And we haven't heard that there are any problems with him obeying what we contend are the narrowest and least obtrusive remedies that the evidence supported. Now, finally, although this didn't come up, I think that I should note that a new issue came up in the reply brief and our motion to strike was denied, but our position is that if the Court does entertain that new argument on burden of proof, which we think it would be fly in the face of all this Court's rulings to do so, but if it does and reaches the merits. I wish to point out the two cases, Ninth Circuit cases that the sheriff relies on are Mayweather's versus Newland and Hallett versus Morgan. Neither case supports their argument in the slightest. Mayweather's involved not a termination hearing, but a motion for a preliminary injunction. The burden of proof is always on the plaintiffs seeking a preliminary injunction. It has nothing to do with the burden of proof in a termination hearing. Hallett versus Morgan involved a motion by plaintiffs to extend a time-limited consent decree beyond its expiration date. The Court held that the decree did expire, and the defendant's termination motion was therefore moot. And since it was moot, the Court couldn't possibly have held anything about the burden of proof on a termination motion. And the plaintiffs in any event had it. They were the proponents of the motion to extend a time-limited consent decree. The burden was obviously on them. Had there been an irreconcilable conflict between either of those cases and Gilmore, on-bank review would have, of course, been required, and that did not occur. Thank you. Roberts. Thank you. We thank you for your argument. You've used your time, but I understand the importance of the issue to the county. If you have one minute, but no more than one minute worth to tell us. Thank you for your deference, Your Honor. I do appreciate it. I did not have an opportunity to discuss the temperature issue, so if the Court has any questions for me, I'd be happy to answer it. The only point that I have regarding that comes back to the remedies phase and also that the remedy that the Court ordered was overbroad. There was no evidence that only setting a thermostat at a certain degree would keep people maintaining their health and safety. There are other ways that certain things like that could occur, such as hydration and air ventilation and things like that. The class's own expert said that the ventilation and the air control was good, except for in just a minute area. So if that was the case, then inmates in that minute area could have been removed until the air ventilation was fixed. Thank you. We thank both counsel for your argument. The case just argued is submitted.
judges: Fletcher B. , Clifton, Bea